## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BRIAN NACE,

     *Plaintiff*,

v.                        CASE NO. 13-CV-12770

COMMISSIONER OF SOCIAL        DISTRICT JUDGE JOHN CORBETT O'MEARA
SECURITY,                  MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.   REPORT

#### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned to review the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, §§ 1381-

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

1383f. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 17.)

Plaintiff Brian Nace was thirty-seven years old during the most recent administrative hearing. (Transcript, Doc. 9 at 31, 152.) His work history includes jobs as a janitor and a machine operator. (Tr. at 190, 214.) On April 29, 2011, Plaintiff filed the present claims for SSI, alleging that he became unable to work on August 1, 2009. (Tr. at 152.) The claims were denied at the initial administrative stage. (Tr. at 66.) In denying the claims, the Commissioner considered chronic brain syndrome, which is an organic mental disorder, and epilepsy. (*Id.*) On October 31, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") J. Thomas McGovern, who considered the application for benefits de novo. (Tr. at 31-65.) In his decision issued on December 20, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 14, 25.) Plaintiff requested a review of this decision on February 11, 2013. (Tr. at 8-9.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 8, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On June 24, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

## B.    Standard of Review

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to

the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ

finds contradictions among medical reports, claimant's testimony, and other evidence.")))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

4

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since April 7, 2011, the application date. (Tr. at 16.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: hepatitis C, cognitive disorder, schizoaffective disorder, and anxiety disorder. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (*Id.*) At step four, the ALJ noted that Plaintiff could not perform any past relevant work. (Tr. at 23-24.) The ALJ also found that Plaintiff was thirty-five years old on the application date, putting him in the "younger individual" category. (Tr. at 24.) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform jobs, existing in significant numbers in the regional economy. (Tr. 19-25.)

### E.    Administrative Record

### 1.    Medical Records

The medical records begin in September 2006, with test results indicating Plaintiff had hepatitis C, which was later confirmed by a liver biopsy. (Tr. at 238, 275.) On October 23, 2006,

Plaintiff saw Dr. Gregory Haynes for a gastrointestinal evaluation. (Tr. at 272.) Plaintiff denied fatigue but noted he had progressively worsening palpitations for the prior two years. (*Id.*) The physical examination revealed no abnormalities. (*Id.*) Diagnostic testing later that month showed "mild mitral regurgitation and tricuspid regurgitation," but "[g]ood overall contractility." (Tr. at 274.) During an examination in November, Dr. Henry Tomashevski noted the liver abnormalities, stated that a recent echocardiogram was normal, and found that his chest was clear and heart sounded normal. (Tr. at 273.) In February 2007, Plaintiff again saw Dr. Tomashevski, stating he has headaches, dizziness, and struggled to focus. (Tr. at 271.) Dr. Tomashevski noted that brain magnetic resonance imaging ("MRI") results were normal. (*Id.*)

Plaintiff went to the emergency room on July 27, 2007, complaining that "he has been feeling weird today," specifically, that his back hurt and his abdomen was tender. (Tr. at 243.) He walked into the hospital "with steady gait," the nurse noted. (Tr. at 243.) He appeared comfortable and was cooperative and alert. (*Id.*) The notes mentioned the hepatitis C and also a history of seizures, but stated that he had no psychiatric history. (Tr. at 241.) Plaintiff admitted to smoking cigarettes. (*Id.*) Other than tenderness in his "middle back area," the physical examination was normal, and even the abdomen was non-tender. (*Id.*) His strength and range of motion were normal. (Tr. at 244.) The physicians noted that the x-rays were normal and that Plaintiff was "neurologically intact." (Tr. at 243.) The final diagnosis was "acute back injury," and he was discharged home with a friend. (Tr. at 244.)

In October 2007, Plaintiff returned to Dr. Tomashevski with recurring abdominal pain. (Tr. at 270.) His abdomen was soft and non-tender during the examination. (*Id.*) The notes also indicated possible dysuria, frequency, and urgency, (*Id.*), a urinary issue. *See* Keith Wrenn,

8

*Dysuria, Frequency, and Urgency*, *in* Clinical Methods: The History, Physical, and Laboratory Examinations, 842, 842 (H. Kenneth Walker, et al., eds., 3d ed. 1990). No other issues were noted.

Plaintiff visited Dr. Sidarshan Singal in late May and early June, 2008, to treat rectal and abdominal pain. (Tr. at 257-58.) Dr. Singal noted that Plaintiff had been on a sixth month interferon treatment for his hepatitis C. (Tr. at 258.) The "physical examination was unremarkable," and Dr. Singal planned to refer Plaintiff to Dr. Ana Lok for interferon therapy and to schedule a colonoscopy for the following week. (*Id.*) The colonoscopy results were normal, except for "a few small-size uncomplicated internal hemorrhoids . . . ." (Tr. at 256.)

Plaintiff went to the emergency room on June 2, 2008, with rectal and abdominal pain. (Tr. at 267.) He was "[a]ble to rise in a single movement," and described the pain as moderately severe, exacerbated by moving. (*Id.*) The physical examination uncovered nothing wrong, and the notes state Plaintiff provided his own description of his medical history and was alert with normal affect, insight, and concentration. (Tr. at 268.) The notes then indicate, abruptly, that Plaintiff decided to forgo further testing and treatment. (*Id.*) The physician explained the risks of this course and determined that Plaintiff "appeare[d] clinically to have capacity to make this decision." (*Id.*)

Dr. Lok wrote a report for Drs. Singal and Tomashevski on June 25, 2008. (Tr. at 248.) Plaintiff had come to their appointment "with some dizziness" and generalized pain. (*Id.*) His list of past complaints included "fatigue, headache, feeling anxious, sweating, shakiness, abdominal discomfort, palpitations, achiness all over as well as anxiety and depression and ringing in the ears." (Tr. at 249.) Now, according to Plaintiff, he did not experience any of these symptoms except for anxiety. (*Id.*) He also stated that he attended Alcoholics Anonymous and Narcotics Anonymous meetings. (*Id.*) He also informed her that he had a girlfriend. (*Id.*)

9

His previous treatment for hepatitis was pegylated interferon and ribavirin therapy, which he completed over six months. (Tr. at 248.) The reports from the treatments were incomplete, Dr. Lok noted, but he "could not recall any side effects." (*Id.*) She wrote that he was diagnosed with seizure disorder a decade ago, but had not experienced any since then and she was "very doubtful about that diagnosis." (*Id.*) His abdominal pain had resolved. (*Id.*) Dr. Lok then discussed "possible re-treatment" for hepatitis C. (*Id.*) She noted that, given his other issues, "we are not in a hurry to consider re-treating him," though she hoped they could in the future and requested more medical records to help make that determination. (Tr. at 249.)

Dr. Lok wrote again on October 30, 2008, lamenting that neither she nor Plaintiff had been able to track down records from his previous treatment. (Tr. at 251.) Since their last visit, Plaintiff had not developed any "new medical conditions" and reported generally good health. (*Id.*) He also continued attending narcotic and alcohol addiction meetings. (*Id.*) He was not experiencing many of the symptoms he had in the past, but again mentioned continuing anxiety, particularly in large crowds. (Tr. at 251-52.) He was seeking a therapist, though the issue "has not otherwise impacted his life more significantly," Dr. Lok noted. (Tr. at 252.) Likewise, he denied "any remarkable fatigue, sedation, or confusion." (*Id.*) The examination notes stated he was "alert, oriented, and pleasant," he had normal gait and sensory motor stills, and lacked any other abnormalities. (*Id.*) Reviewing test results, Dr. Lok observed that "there [was] no indication based on available biomarker that Mr. Nace's stage of hepatic disease has increased since his prior visits." (*Id.*) The decision to re-treat hinged on results from the prior treatment. (Tr. at 252-53.) Thus, Dr. Lok and Plaintiff both intended to request documents "directly from the labs where he was being monitored

10

. . . ." (Tr. at 253.) If the results showed the past treatment was ineffective, Dr. Lok concluded that she would see him annually until new treatment modalities developed. (*Id.*)

The next record is a emergency room report from July 25, 2009, after a dog scratched Plaintiff's eye. (Tr. at 281-85.) The initial triage assessment did not discern any learning or communication barriers. (Tr. at 283.) Plaintiff estimated that he smoked one pack of cigarettes per day. (*Id.*) Other observations during the examination found Plaintiff to be generally normal. (Tr. at 281-82.)

Also in July and August of 2009, Plaintiff had laboratory work done. (Tr. at 307-18.) The reports lack any commentary describing the findings, and the other handwritten notes are nearly illegible. The tests seem to relate to Plaintiff's hepatitis C, which Plaintiff sought to have treated. (Tr. at 311.) A few notes also mention sexual issues, and the doctor gave Viagra and considered testing his testosterone levels. (Tr. at 311, 315.) Other reports document his complaints of diffuse pain, dysuria, and anxiety. (Tr. at 312-14.)

On August 19, 2011, Dr. Jack Salomon conducted a consultative examination of Plaintiff for the state agency administering disability benefits. (Tr. at 286.) Plaintiff informed Dr. Salomon that he was disabled due to "memory loss, seizures, epilepsy, chronic kidney failure, body pains, back pain, hepatitis C, cirrhosis of the liver, kidney stones, dementia and anxiety." (*Id.*) He explained that seizures occurred three times per month. (*Id.*) Further describing his declining health, Plaintiff stated that he recently gained twenty-five pounds, had frequent fevers and headaches, and asserted he had all of a long list of maladies, including hearing, vision, dental, urinary, musculoskeletal, and cardiovascular issues. (*Id.*) He coughed and was short of breath, he claimed, but admitted he had smoked one pack of cigarettes per day for the past fifteen years. (*Id.*)

11

He felt weak and tired, suffered dizzy spells, convulsions, numbness, testicular pain, and rashes. (*Id.*) He had asthma but took no medicine for it. (*Id.*) He told Dr. Salomon that his father beat him in the head with a baseball bat, and noted "memory loss and confusion, nervousness, depression and trouble sleeping." (Tr. at 286-87.) Plaintiff was not taking any medications because he lacked insurance. (*Id.*)

The physical examination with Dr. Salomon was unremarkable. (Tr. at 287-91.) Plaintiff displayed normal gait and "had no trouble walking heel to toe, on his toes and on his heels, or in squatting."[2] (Tr. at 287.) His muscles were not atrophied and his reflexes and strength were normal. (Tr. at 287-91.) His mental status was generally normal: "He seems to be oriented to time, place and person. His dress was a little bit sloppy, and his intellectual functioning was somewhat diminished. I didn't see any memory lapses from what I could detect, or in any inappropriate actions or affect. His speech was responsive to the questions." (Tr. at 287) Dr. Salomon ended without providing a clear assessment, instead indicating simply that Plaintiff gave "a history of cirrhosis of the liver and a history of recurrent kidney stones. History of seizures. We have no documentation for none [sic] of this."[3]

Dr. Hugh Bray, a licensed psychologist, provided a mental health consultation examination on October 18, 2011. (Tr. at 292-99.) A friend brought him to the interview, but Plaintiff provided

---

[2] Plaintiff's motion criticizes the ALJ's decision for stating that this examination found Plaintiff had no problems walking. (Tr. at 21; Doc. 15 at 22.) He quotes Dr. Salomon's report as stating, "He *had* trouble walking heel to toe, on his toes and on his heels, or in squatting." (Doc. 15 at 22.) The report clearly indicates the opposite and the ALJ accurately summarized it in his decision.

[3] This last statement, noting the lack of documentation, appears to be the source of Plaintiff's complaint in his motion that "the State Agency did not provide [Dr. Salomon] with plaintiff's records . . . ." (Doc. 15 at 8.) Plaintiff's conclusion is not entirely borne out by the statement, which could indicate simply that the evidence of kidney stones, cirrhosis, and seizures was lacking. Indeed, nothing in the record up to this point clearly demonstrates those issues.

12

the information during the session. (Tr. at 292.) Plaintiff reported "brain disease and dementia," and stated that he experienced three to five seizures per month, causing him to lose consciousness. (*Id.*) He also claimed to have memory problems. (*Id.*) He again recalled being hit in the head with a bat when he was younger. (*Id.*) He denied any inpatient or outpatient mental health treatment. (Tr. at 293.) Among his symptoms, he claimed knee issues, arm pain, "limitations/restrictions in standing, sitting, twisting, bending, lifting, squatting and walking." (*Id.*) While Plaintiff reported pain, Dr. Bray wrote that he did not observe any "[p]ain [b]ehavior," though he did note elsewhere that Plaintiff had back, leg, and arm pain. (*Id.*) The pain was at level eight out of ten on a visual analog ("VA") scale. (*Id.*) Plaintiff had experienced "no significant weight change in the last four months," and reported sleeping fourteen hours per night. (*Id.*)

Plaintiff told Dr. Bray that he had a few siblings whom he talked to, and lived with his friends. (*Id.*) He was currently single. (*Id.*) His prior job as a machine operator ended when the company downsized and he was laid off. (*Id.*) During the job, he "had a poor work relationship with supervisors" and frequently argued with peers. (*Id.*) Plaintiff then rated his relationships with various groups: "Fair" for family members, friends, and Dr. Bray; "Poor" for co-workers and employers. (Tr. at 294.) His past interest was plaster work, and his current hobby was his pet dog. (*Id.*) His daily activities were completed "independently," including, "check cashing, attending church, watching [television] taking walks, playing cards, and making appointments." (*Id.*) This did not show age-appropriate autonomy, Dr. Bray concluded. (*Id.*) Plaintiff stated he repeated fifth grade and dropped out of school after ninth grade. (Tr. at 293.)

Dr. Bray observed that Plaintiff's hygiene and grooming were appropriate, and posture, motor activity, and gait were normal. (*Id.*) According to Dr. Bray, Plaintiff's intellectual deficits

limited his contact with reality. (*Id.*) Plaintiff was appropriately involved in the interview, did not do anything unusual or bizarre, did not exaggerate or minimize his symptoms, had modest insight and judgment, and was cooperative, "sparsely responsive," and "mentally lethargic." (*Id.*) His thoughts were "simple and concrete, and vague," but his speech was adequate and what he said was age appropriate. (*Id.*) He denied delusions and suicidal thoughts. (*Id.*) Dr. Bray observed that he was "distant, withdrawn, vague, suspicious, anxious, fearful and reserved." (Tr. at 295.) During memory tests, he could recall one of three objects after three minutes, named two ex-presidents, could repeat seven numbers forward and five numbers backward, and knew his own birthday. (*Id.*) The information portion of the test was adequate; he knew the president, a current famous person, and four out of five big cities, but he did not know the governor's name. (*Id.*) He completed addition and subtraction, but not multiplication and division. (*Id.*) It appeared to Dr. Bray that Plaintiff's "concentration, attention, persistence and effort today were . . . average." (*Id.*) However, Plaintiff did not attempt to complete all tasks and Dr. Bray thought "[h]is attention, persistence, and effort in testing today was reduced compared with today's interview." (Tr. at 296.) His attention and persistence were inconsistent, he needed support focusing, and his behavior was subdued. (*Id.*)

On the Wechsler Adult Intelligence test, Plaintiff's verbal comprehension intelligence quotient ("IQ") was sixty-one, his performance score IQ was seventy-nine, and his full-scale IQ was sixty-three. (*Id.*) These scores, which Dr. Bray considered valid, placed Plaintiff in the "retarded range of cognitive function," and the eighteen point difference between the verbal and performance scores suggested a developmental learning disorder. (*Id.*) Another test rated Plaintiff's reading and math skills at the first-grade level. (Tr. at 297.) The Bender Gestalt test indicated

mental deficiencies, "impulsivity, anxiety, depression, timidity, poor planning skills and tension." (*Id.*) Dr. Bray also noted "soft signs of organicity." (*Id.*) Sentence completion test results reflected the same findings. (*Id.*)

Dr. Bray thought that Plaintiff lacked the ability to handle disability funds, noting that Plaintiff told him he let a friend handle his money matters. (Tr. at 298.) He also concluded that Plaintiff had the "signs and symptoms of a closed-head injury." (*Id.*) In the diagnosis section, he wrote that the brain injury was "[p]ossible," assessed a cognitive disorder, and assigned a Global Assessment of Functioning ("GAF") score of forty. (*Id.*) That score indicates major impairments in functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM-IV-TR"). His mental impairments moderately to significantly impaired his ability to work with peers and supervisors. (*Id.*) His "ability to understand, remember and carry out tasks appears to be moderately impaired." (*Id.*) During the session, he performed only simple, repetitive tasks, and Dr. Bray did not think he could manage anything more complex. (*Id.*) Plaintiff's attention, concentration, persistence, pace, and effort were only mildly impaired, and his ability to withstand stresses at work was moderately affected. (*Id.*) The prognosis was poor, Dr. Bray concluded. (*Id.*)

Dr. Blaine Pinaire, Ph. D., assessed Plaintiff's medical records and conducted a telephone interview with him on November 14, 2011. (Tr. at 72-78.) She assessed two listings in the regulations, 12.02 (organic mental disorders) and 12.09 (substance addiction disorders). (Tr. at 73.) These listings represent impairments that, if the Plaintiff meets or equals, will require a finding of disabled. 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). Dr. Pinaire

determined that, under the listing criteria, Plaintiff's restrictions in daily activities were mild; his difficulties in social functioning were moderate; his troubles maintaining concentration, persistence, and pace were moderate; and he had no repeated episodes of decompensation. (Tr. at 73.) She noted that his "cognitive processes were unremarkable during phone contact . . . ." (*Id.*)

Dr. Pinaire concluded that his ability to remember instructions and work procedures was not significantly limited; his ability to understand and remember detailed instructions was moderately limited; he could carry out short and simple instructions; his ability to carry out detailed instructions was moderately limited; his ability to maintain attention and concentration for extended periods was moderately limited; he could perform scheduled activities and maintain regular, and punctual work attendance; he could sustain ordinary, unsupervised work routines; he could work with others without distraction; and he could make simple decisions. (Tr. at 75-76.) He would experience moderate limitations completing the workweek without psychological distractions. (Tr. at 76.) Likewise, his social interactions with the public and supervisors were moderately limited. (*Id.*) He could "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." (*Id.*) His only other moderate limitation was in his ability to deal with changes in the workplace. (*Id.*) Dr. Pinaire ended by noting that Plaintiff could complete simple tasks and "make judgments that are commensurate with the functions of unskilled tasks, i.e., work-related decisions; respond appropriately to supervision, coworkers and work situations; and deal with most changes in a routine work setting." (Tr. at 77.) He could concentrate long enough to perform simple, one- and two-step tasks. (*Id.*)

Plaintiff saw Dr. Scott Stryd on January 13, 2012, complaining of "diffuse pain in his joints and abdomen," and also requesting to consult about his hepatitis. (Tr. at 301.) Plaintiff informed

16

him that he had not followed up with Dr. Lok, and that the doctor treating his hepatitis C "closed his office several years ago." (*Id.*) He was attending counseling for his anxiety. (*Id.*) He had prescriptions for a pain reliever and a muscle relaxant. (*Id.*) Dr. Stryd wrote that he "appears well, in no apparent distress" and was "pleasant and cooperative." (Tr. at 302.) He assessed chronic pain and told Plaintiff to return if it did not improve. (*Id.*)

Plaintiff began attending therapy sessions at Community Care Services in August 2012. (Tr. at 338, 354.) The initial assessment report was completed on August 11 by Cheryl Triplett, a limited license mental health practitioner. (Tr. at 340, 353.) Plaintiff now claimed to be paranoid, have anger issues, experience auditory hallucinations, and have rapidly vacillating mood swings. (Tr. at 340.) He was not currently taking psychotropic drugs, and denied suicidal ideations despite admitting to suicide attempts, most recently during the previous year. (*Id.*) One attempt "to hurt himself" when he was ten led to an inpatient hospitalization, and he also reported he was hospitalized within the past year. (Tr. at 348.) He last used drugs eight years ago and after residential and outpatient treatment had managed to stay sober. (Tr. at 349.) He attended meetings as part of the treatment. (*Id.*)

He had never been married, he stated, but was currently in a long-term relationship. (Tr. at 341.) He lived with family and listed his sister as the emergency contact. (*Id.*) Plaintiff told Ms. Triplett that his mother was murdered when he was nine years old, he lived with his father until he was thirteen, and then stayed with relatives "because he had injured another child." (Tr. at 342.) He then moved back to his father's, then to sister's, and finally he lived with "a girl" for three years, with periods of homelessness interspersed throughout this time. (*Id.*) Afterwards, he lived on the streets again and abused drugs. (*Id.*) He was not close with his siblings, did not get along

17

with peers, but related to older people. (*Id.*) At his last job, four years ago, he "got in an argument with employees because he felt they weren't doing their job," he was later laid off and he received unemployment benefits. (Tr. at 343.) His criminal history included arrests for home invasion, driving on a suspended license, and assault and battery. (*Id.*) He dropped out midway through high school "because he felt he could not understand what was being taught." (*Id.*) However, in response to the question "Do you have a learning disability?" Plaintiff replied, "No." (*Id.*)

He told Ms. Triplett that he lacked a car and a driver's license, so he walked or rode his bicycle for transportation. (Tr. at 344.) His support system consisted of his sister, the only person with whom he was "comfortable" discussing his problems. (*Id.*) He said that he was a "good uncle." (Tr. at 345.) He had no involvement in his community, and did not want to be more involved. (*Id.*) Interests included watching television and gardening. (*Id.*) Depression limited his activities, he reported. (*Id.*) He did not feel that he had any communication barriers or needed special accommodation to communicate. (*Id.*) The childhood development history portion of the form was left blank, as Plaintiff was "unsure" of the answers. (Tr. at 346.) Plaintiff's lack of insurance limited his medical treatment, but he recently started seeing a primary care provider. (*Id.*) He now smoked three packs of cigarettes per day, and still had three about seizures a month and rectal, back, and side pain. (*Id.*) He exercised regularly, for at least thirty minutes at a time, biking and walking. (Tr. at 348.)

Ms Triplett concluded that Plaintiff's general knowledge was "intact," but that his intellectual functioning was below normal. (Tr. at 351.) He had schizoaffective disorder, antisocial personality disorder, and problems with his social environment, occupation, housing, finances, and behavior. (Tr. at 352.) His GAF was forty-seven, indicating serious symptoms. Am. Psychiatric

18

Ass'n, *supra* at 34. He presented with "psychosis and mood disorder," social anxiety, fatigue, and he felt depressed. (*Id.*) He refused to take psychotropic medicine and said he was not currently suicidal. (*Id.*) Ms. Triplett considered him eligible for outpatient services. (*Id.*)

A few weeks later, on August 26, he attended a group session at Community Care Services. (Tr. at 338-39.) His next appointment there came on November 9, with Dr. Keum Kang, M.D. (Tr. at 332-37.) Dr. Kang noted that Plaintiff "presents with psychosis and mood disorder," (Tr. at 336), and Plaintiff claimed that his major problem was social anxiety. (Tr. at 332.) Occasionally, he would "feel like hurting myself and others," and he had twice attempted suicide. (*Id.*) He currently lived with a female friend and her two sons, and he completed housework for her. (*Id.*) His father was emotionally and physically abusive, and he no longer spoke with him. (Tr. at 334.) Dr. Kang wrote that Plaintiff's appearance was appropriate, his eye contact was good, and he had a cooperative attitude. (*Id.*) His speech was normal and fluency fair; his thought process was logical and organized. (*Id.*) He experienced some persecutory auditory delusions. (*Id.*) He appeared depressed and anxious, and his energy level was decreased, but his affect was appropriate, full and reactive. (Tr. at 335.) Despite his earlier statements, he denied suicidal or homicidal thoughts. (*Id.*) He was fully oriented to his surroundings, his memory was intact, his insight was limited, and his judgment was fair. (*Id.*) Dr. Kang diagnosed schizoaffective disorder, recurrent major depression with severe psychosis, post-traumatic stress disorder, and anti-social personality disorder. (Tr. at 336.) He assigned a GAF score of forty-seven. (*Id.*) Overall, Plaintiff's prognosis was fair, and he prescribed medications and recommended that Plaintiff continue attending addiction meetings. (*Id.*)

In October 2012, Plaintiff saw Dr. Roja Ramisetty. (Tr. at 324-25.) A medical questionnaire, signed by Plaintiff, indicates a host of current and past issues, including high blood pressure, hernias, heartburn, cancer, diabetes, gastritis, and hemorrhoids. (Tr. at 324.) Plaintiff wrote that he did not have asthma. (*Id.*) Moreover, he had, among other problems, chest pain, headaches, difficulty hearing and seeing, shortness of breath, muscle pain, rashes, nausea, abdominal pain, rectal problems, numbness, seizures, dizziness, depression, confusion, anxiety, and anemia. (Tr. at 325.) The physician ordered laboratory tests, which again confirmed hepatitis C. (Tr. at 319.) The treatment notes are difficult to decipher, but they include prescriptions for medications. (Tr. at 326-28.) In a letter to the referring physician, Dr. Ramisetty explained that Plaintiff was seeking treatment for his hepatitis. (Tr. at 329.) He still could not find his prior treatment records, and Dr. Ramisetty recommended "triple therapy after getting psychiatric clearance." (*Id.*)

## 2. Application Forms and Administrative Hearing

Lorraine Gonzales filled out a Function Report for Plaintiff on June 25, 2011. (Tr. at 198-205.) Plaintiff reported that he lived at his friends' house, but considered himself homeless. (Tr. at 198.) He reported epilepsy, pain in his stomach, kidney, and limbs, and "somewhat of a memory problem." (*Id.*) He passed the days eating and watching television; he had no dependents or pets that were his responsibility. (Tr. at 199.) Personal care presented no problems, he stated, but he sometimes needed reminders to bathe or shave. (Tr. at 199-200.) Friends prepared his meals for him. (Tr. at 200.) The pain prevented him from doing any indoor or outdoor housework. (*Id.*) Though he did not drive, he traveled in cars and would go out only if his father or friends accompanied him. (Tr. at 201.) He did not shop but could pay bills, count change, handle a savings

account, and use checks. (*Id.*) Before he became disabled, he stated he could work and "was always busy . . . ." (Tr. at 202.) He spent time with others every day watching television and eating. (Tr. at 202.) His father went with him to his friends' houses. (*Id.*) He wrote that he has anxiety, but did not have "any problems getting along with family, friends, neighbors, or others[.]" (Tr. at 203.)

Plaintiff asserted that his conditions affected the following capabilities: lifting, squatting, bending, standing, reaching, walking, kneeling, memory, completing tasks, concentrating, and following instructions. (*Id.*) Left unselected from this capabilities list were, among others, understanding and getting along with others. (*Id.*) He could walk one block before needing to rest and could pay attention for "about an hour." (*Id.*) Finishing tasks was difficult and, when asked how well he followed spoken instructions, he replied, "I can do some of the information." (*Id.*) He had problems relating to authority figures. (Tr. at 204.) He did not use assistive devices, such as a walker, cane, or wheelchair. (*Id.*) Finally, he noted he did not use medication because he lacked insurance. (Tr. at 205.)

On October 31, 2012, Plaintiff attended an administrative hearing before an ALJ. (Tr. at 31-65.) Plaintiff's counsel began with a brief statement, arguing that "based on the records and the consulting exams . . . Mr. Nace's case meets or equals listed impairment 12.02 and/or 12.06 based on anxiety, [post-traumatic stress disorder], as documented . . . ." (Tr. at 33.) Plaintiff then testified that he lived with a friend, left school after the ninth grade, and did not use any assistive devices. (Tr. at 34.) He last worked in 2008 operating a spray-paint machine; he left because he argued with the foreman "and they kind of laid me off unjustly, I think," he stated. (Tr. at 35-36.) His difficulty concentrating precluded work, he added, noting that it began in school. (Tr. at 36.) His hepatitis C still affected him, causing him to sleep twelve to fourteen hours per day. (Tr. at 37.) The only

21

treatment he received for it was the six-month initial round of medications, and he was not taking anything for the hepatitis at the time of the hearing. (*Id.*) His sides and stomach continued to ache everyday, even with prescription medicine. (Tr. at 37-38.)

Therapy sessions addressed his depression, anger, and other childhood issues. (Tr. at 38-39.) Before these sessions, he had not received any mental health treatment. (Tr. at 44.) He also disliked crowds, finding that they caused shortness of breath and a racing heart. (Tr. at 40.) He would avoid crowds and shop only with friends. (Tr. at 40-41.) Plaintiff's attorney then explained that the gaps in his treatments after 2009 occurred until he obtained Medicaid. (Tr. at 42.) She added that he just received a prescription for Risperdal and Zoloft, evidenced by records that were not yet marked as exhibits. (Tr. at 42.)

Plaintiff told the ALJ that he was not diabetic, but had low blood sugar levels. (Tr. at 44.) His attorney then added that he just had another liver biopsy to examine his hepatitis C and determine "if he will be a candidate for the Interferon again." (Tr. at 45.) They requested records, but had not yet received any. (*Id.*) Nor had they been able to track down the records from his first interferon sessions; the doctor had moved out of state and could not be reached. (Tr. at 45-46.) The attorney said the reason those sessions stopped early was because the doctor moved. (Tr. at 46.)

The ALJ then asked about Plaintiff's daily activities. (*Id.*) Plaintiff stated he slept fourteen hours a day, but intermittently, waking for an hour or so at a time before falling back asleep. (Tr. at 46-47.) Some days he stayed in his pajamas. (Tr. at 47.) When he needed to dress, to go to his father's or sister's, he could do so on his own; he could also handle personal care but needed reminders to bathe. (*Id.*) He did not cook, but stated that he could. (*Id.*) His friend took care of all housework; he watched television programs, particularly "Law & Order." (Tr. at 47-48.) He did

not have a computer or cell phone. (Tr. at 48.) His driving license was suspended for failing to pay fines, though he had driven as recently as one month prior. (Tr. at 48-49.)

He visited his father and sister a few times a week, but stated that he did not talk with them during the visits, instead watching television at their houses. (Tr. at 49.) His father or sister would drive him places, yet he testified that he did not shop and had only one friend. (Tr. at 50.) He did not attend church or participate in any other recreational activities. (*Id.*) Plaintiff never walked or took public transportation; his friend bought groceries and he sometimes accompanied her. (Tr. at 50-51.) He testified that he was not looking for work. (Tr. at 51.) He could not read or write, he stated, but then admitted he could read job applications and write his name and address. (Tr. at 51-52.) His difficulty was remembering what he read. (Tr. at 52.) He took Xanax for anxiety and suffered panic attacks even when not in public. (Tr. at 52.) His heart raced, his breathing drew shallow, and he sweated during the episodes. (*Id.*) These panic attacks at home occurred about once per month. (*Id.*) His friend had a pet, but Plaintiff did not help care for it. (Tr. at 52-53.)

Plaintiff's attorney then asked him about his physical problems. (Tr. at 53.) He stated that a doctor told him the numbness in his limbs resulted from poor circulation. (*Id.*) His "kidney area" also hurt; a doctor told him it was "[c]hronic kidney failure or something," but he received no treatment. (*Id.*) His limbs and bones hurt as well, and a physician planned to run diagnostic tests to discover why. (Tr. at 54.) The friend accompanied him to the hearing because he did not feel comfortable without her. (Tr. at 55.) Plaintiff testified that nightmares often wrecked his sleep, causing him to wake for thirty to forty-five minutes before falling asleep. (*Id.*)

The ALJ then asked the vocational expert ("VE") whether the following hypothetical individual could function in the workplace:

23

Assume that a hypothetical individual, same age as the claimant, same education and work experience. Assume this person could work at a restricted light level that is lift 10 pound, for every 20 pounds [sic]. Occasionally, sit for two hours, stand for six hours, requiring the ability to sit and stand as needed. The individual should not work around unprotected heights, or around open hazards. The individual would require simple, unskilled work in a low-stress work environment, meaning non-production, only occasional work decisions, and minor changes in work settings. This individual should have limited contact with the general public, and limited contact with co-workers, meaning only brief and superficial interactions.

(Tr. at 57-58.) The VE responded that the individual could not perform any of Plaintiff's past work as a janitor or machine operator. (Tr. at 58.) However, the individual could perform other unskilled and light level work: packer (1000 positions in southeast Michigan); sorter (1200 in southeast Michigan); and bench assembler (3200 positions). (*Id.*) The ALJ then added additional restrictions: "Assume this individual . . . would be restricted [to lifting] . . . up to 10 pounds only, regularly and occasionally, sitting for six hours, standing for two hours, again with the sit/stand option and the other limitations . . . ." (Tr. at 58-59.) The individual could work as an assembler (1600 positions in southeast Michigan); an inspector (1200 positions); and a packer (1500 positions). (*Id.*) If the individual was further limited to maintaining concentration during only eighty-percent of the workday, all competitive employment would be precluded. (Tr. at 59.) The individual would also be unable to find work if he "was likely to be absent, or leave work early, greater than two time[s] per month . . . ." (*Id.*)

Plaintiff's attorney then asked what affect on employment would occur if the "same individual also was significantly impaired in being able to relate to not just co-workers, but to supervisors . . . ." (Tr. at 60.) "A significant impairment would preclude competitive employment," the VE replied. (*Id.*) The ALJ then inquired about what this impairment entailed; the VE interpreted it as "no useful ability" to function with supervisors, and the attorney agreed. (*Id.*) The

24

attorney further explained that she considered "significant" to mean "extreme." (Tr. at 61.) The VE

testified that an individual who had ongoing arguments with his supervisors could "typically" not

maintain his position; but the VE added that "[t]here are different levels of an argument also." (Tr.

at 62.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that had the residual functional capacity ("RFC") to

> perform sedentary work as defined in 20 CFR 416.967(a) except the claimant can
> sit for six hours and stand/walk for two hours in an eight hour workday, but must be
> allowed to alternate between sitting and standing at will. He cannot work with or
> around unprotected heights or open hazards. The claimant is limited to simple,
> unskilled work in a low stress environment, which is described as having no
> production rate work, only occasional decision-making required, and few changes
> in work setting. The claimant is limited to brief and superficial interactions with
> coworkers and the public.

(Tr. at 19.) Light work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying
> articles like docket files, ledgers, and small tools. Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and standing is
> often necessary in carrying out job duties. Jobs are sedentary if walking and standing
> are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his

application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to

whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff's first argues that his impairments meet or equal Listing 12.05C and 12.02. (Doc.

15 at 12-19.) Listing 12.05C is met, according to Plaintiff, because the record contains qualifying

IQ scores and evidence of significant adaptive functioning limitations prior to the age of twenty-two. (*Id.* at 13-15.) Specifically, Plaintiff points to his statements regarding his childhood as sufficient evidence to establish those adaptive functions deficits. (*Id.*) He contends that Listing 12.02 is met because Dr. Bray stated he displayed signs of a head injury, he told others that he was hit in the head by a baseball bat, and he had schizoaffective disorder and memory problems. (*Id.* at 15-17.) Additionally, he attacks the ALJ's analysis of his social functioning, contending that the ALJ overemphasized his shopping trips and time spent at friends' houses. (*Id.* at 17.) Similarly, the ALJ erred by citing Plaintiff's television habits as evidence he could concentrate. (*Id.* at 18.) Finally, he highlights evidence that his math skills are deficient and questions why Ms. Gonzales stated on the Function Report that he could handle his finances when he "specifically told Dr. Hugh Bray that he gives money matters to [her]." (*Id.* at 18. (emphasis omitted).)

Plaintiff also criticizes the ALJ's credibility analysis; specifically that it cited Plaintiff's unemployment benefits as evidence against him. (*Id.* at 20.) He quotes a 2006 memorandum from the chief ALJ stating that receipt of such benefits, which generally require the recipient affirm his ability and willingness to work, is not always inconsistent with a finding of disability. (*Id.* at 20); Memorandum from Chief Judge Frank A. Cristaudo to Regional Offices (Nov. 15, 2006). Plaintiff next contends that nothing in the record contradicts his testimony regarding panic attacks, and that the treatment gaps resulted from lack of funds and the cognitive inability to find financial assistance. (Doc. 15 at 20-21.)

He then argues that the ALJ misquoted and mischaracterized evidence. (*Id.* at 21-22.) First, he contends that Dr. Salomon found "[h]e *had* trouble walking heel to toe, on his toes and on his heels, or in squatting. (Tr. 287)." As pointed out above, this quotation is incorrect; Dr. Salomon

26

wrote, "He had normal gait. He had no trouble walking . . . ." (Tr. at 287.) Next, he corrects the ALJ's statement that no source "observed distractibility or signs of psychosis," (Tr. at 21), noting that Dr. Kang diagnosed psychosis, (Tr. at 336). (Doc. 15 at 22.) Finally, he asserts that the ALJ cherry-picked evidence from Dr. Bray's report; first, by questioning the IQ score's validity despite Dr. Bray's opinion, acknowledged by the ALJ, that the scores were valid. (Doc. 15 at 22.) At the same time, the ALJ accepted other portions of the report more favorable to the decision. (*Id.*) Yet, the ALJ had a plausible basis for devaluing the IQ score: Dr. Bray himself wrote that Plaintiff's effort during testing was noticeably reduced from the interview." (Tr. at 296.) The ALJ acknowledged that Dr. Bray thought the score valid, but nonetheless considered the inconsistent evidence and qualified his reliance. (Tr. at 22.)

Plaintiff's last argument seeks to undercut the VE testimony because the hypothetical did not include limitations on contacts with supervisors. (Tr. at 23-25.) Evidence of his difficulties with supervisors is in the record and the VE testified that "significant" impairments with supervisors would preclude employment. (*Id.*) Yet, Plaintiff's attorney at the hearing defined "significant" as "extreme," meaning that Plaintiff would have "no useful ability" to work with supervisors. (Tr. at 60-61.) He also points to Dr. Bray's conclusion, (Tr. at 298), that Plaintiff's ability to relate to coworkers and supervisors was moderately to significantly impaired. (Doc. 15 at 24.) He concludes that the ALJ erred by using some, but not all, of Dr. Bray's opinion: "If the ALJ was relying on the psychologists [sic] listed limitations, he should have included all of the subparts of the opinion on which he relied and not have omitted one significant aspect. This was reversible error." (*Id.* at 25.)

27

Before addressing the merits, the Court must dispose of an initial evidentiary matter. Plaintiff has submitted and relied upon two sets of documents the ALJ did not consider. (Tr. at 355-92; Doc. 15, Ex. 1.) The first is contained in the record, (Tr. at 355-92), but was submitted after the ALJ's decision. (Tr. at 27-28.) It consists of a new psychiatric and intellectual functioning report, conducted subsequent to the ALJ's decision, along with new records regarding hepatitis C and general physical pain, and reports from his first and only hepatitis C treatment in around 2006. (Tr. at 355-92.) Plaintiff attaches the second, smaller set to his motion. (Doc. 15, Ex. 1.) These records, from 2012, discuss general physical problems, such as back pain, and medications. (*Id.*) Plaintiff states he submitted these to Defendant prior to the hearing and provides an "Electronic Records" submission receipt purporting to show that he filed these documents with Defendant on October 22, 2012. (*Id.*, Ex. 2.) While the dates on the attached documents match the dates listed for one of the submissions on the receipt, it is impossible to tell that these were the documents actually submitted.

In this Circuit, the record is closed at the administrative law judge level, thus exhibits provided after the ALJ decision are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review. Therefore, the Court cannot review either set of documents.

Moreover, Plaintiff has not made any argument that these materials merit a "sentence six" remand under 42 U.S.C. § 405(g). That provision allows the district court to remand in light of additional evidence without making any substantive ruling as to the merits of the Commissioner's decision, but only if a claimant can show good cause for failing to present the evidence earlier. *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). The Sixth Circuit has long recognized that a court may only remand disability benefits cases when a claimant carries his burden to show that "the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is only "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (citing *Foster*, 279 F.3d at 353). In addition, "such evidence is 'material' only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357. "'Good cause' is shown for a sentence six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'" *Payne v. Comm'r of Soc. Sec.*, No. 1:09-cv-1159, 2011 WL 811422, at *12 (W.D. Mich. Feb. 11, 2010)

With the exception of the post-decision mental health evaluation, (Tr. at 355-61), these documents existed prior to the hearing. Plaintiff contends that some of these reports were difficult to find, (Doc. 15 at 6 n.8), and the record bears out Plaintiff's efforts to obtain them even before filing for disability benefits. (Tr. at 45-46, 251.) Nonetheless, nearly two years passed between the application and the ALJ decision; the evidence is not sufficiently new. Even the new mental evaluation would not qualify because it does not come from continued medical treatment but

appears instead to be a one-shot examination aimed at proving disability. It ends by recommending that he apply for benefits and concluding that he could not maintain employment. (Tr. at 360.) Additionally, none of the materials address Plaintiff's main arguments, which deal with his mental impairments. (Doc. 15 at 12-19.)

In any case, Plaintiff has waived the "sentence six" remand argument by not addressing it in his motion. *See, e.g.*, *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (holding that "arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived"); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner); *Preston v. Comm'r of Soc. Sec.*, No. 12-13327, 2013 WL 4550512, at *7 (E.D. Mich. Aug. 28, 2013) (finding waiver where "Plaintiff failed to identify a specific medical opinion the ALJ erred in evaluation") (adopting Report & Recommendation).

For the same reasons, Plaintiff has waived any argument that the record was incomplete because it did not contain the documents he purportedly submitted. (Doc. 15, Exs. 1, 2.) Courts sometimes remand when a significant piece of evidence is missing from the record, for example, where key testimony from the hearing is missing. *See Russell v. Comm'r of Soc. Sec.*, 32 F. App'x 739 (6th Cir. 2002) (holding that "[b]ecause the Commissioner has not filed such a transcript, but submitted a reconstructed file which lacks much of the evidence relied upon by the administrative law judge, it is appropriate for us to remand for a rehearing pursuant to sentence four of section 405(g)"); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996) (remanding where "the hearing record upon which the ALJ relied was significantly compromised by the failure to transcribe a portion of

[the medical expert's] testimony"). However, courts deny remand requests where the missing evidence is meager or immaterial. *See, e.g.*, *Ward v. Hecker*, 786 F.2d 844, 848 (8th Cir. 1986) ("The gaps appear very small, . . . at most a few words at a time. Although distracting, the gaps did not interfere with comprehension of the testimony to the extent that would hinder fair review."); *Earls v. Callahan*, No. 96-1200-JTM, 1997 WL 624859, at *5 (D. Kan. Sept. 8, 1997) (same); *Jones v. Comm'r of Soc. Sec.*, No. 1:10-CV-164, 2011 WL 1527159, at *6 (E.D. Tenn. Apr. 4, 2011) (refusing to remand where the missing evidence was a few lines allegedly spoken at the end of the hearing after plaintiff's counsel said they had nothing further to add), *adopted by* 2011 WL 1526978 (E.D. Tenn. Apr. 20, 2011). The problem does not clearly arise here because there is no indication the ALJ considered any of the supposedly submitted materials. (Tr. at 27-28.) And again, the documents, detailing physical issues, are not directly related to Plaintiff's present arguments, centered on mental capacities. Finally, and most importantly, Plaintiff has not argued for remand due to an incomplete record.

### a.  Listing 12.05

The ALJ's listings analysis was adequate. Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof: listed impairments preclude any gainful activity, not just substantial gainful activity. *See Zebley*, 493 U.S. at 525; 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id. See also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not

qualify."). Alternatively, medical equivalence to a Listing can occur in three situations where the claimant fails to meet all of the criteria:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 n.2 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1526).

The Sixth Circuit has held that in order to meet a Listed Impairment under 12.05, a plaintiff must satisfy the diagnostic description or definition as well as the severity requirements listed in subsections (A) through (D). 20 C.F.R. § 404.1520, Subpart P, App. 1, listing 12.05; *Foster v. Haller*, 279 F.3d 348, 354-55 (6th Cir. 2001). To meet listing 12.05(C), a claimant must show that (1) he experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period (i.e., before the age of twenty-two); (2) he has a verbal, performance, or full scale IQ of sixty through seventy; and (3) he suffers from a physical or other mental impairment imposing an additional and significant work-related limitation on function. *Turner v. Comm'r of Soc. Sec.,* 381 F. App'x 488, 491 (6th Cir. 2010). The first prong is called the "diagnostic description," and applies to all of Listing 12.05's alternative requirements. *Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007).

"Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007). IQ scores alone are insufficient to satisfy Listing 12.05(C). *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("[T]wo IQ scores of 70, without more, do[] not satisfy the

32

requirements of listing 12.05(C)"). Moreover, an "actual diagnosis of mental retardation is not required to satisfy listing 12.05(C), but the ALJ may consider the fact that no such diagnosis exists." *Bason v. Comm'r of Soc. Sec.*, No. 12-15033, 2014 WL 1328168, at *14 (E.D. Mich. Mar. 31, 2014).

The ALJ here rejected Listing 12.05 because very little evidence shows Plaintiff developed subaverage intellectual functioning with deficits in adaptive function prior to age twenty-two, the so-called developmental period. (Tr. at 19.) He cited the only evidence in the record potentially addressing this period: Plaintiff's report that he failed the fifth grade and dropped out after ninth grade. (*Id.*) Plaintiff attempts to add evidence, but the totality remains meager and insufficient. First, part of what the Plaintiff cites to show he lived on the streets and abused drugs as a youth consists of self-reports made after the decision, which cannot be considered. (Doc. 15 at 15 (citing Tr. at 356.).) Similar statements appear in exhibits the ALJ examined: Plaintiff told Ms. Triplett he was homeless during a few periods prior to turning twenty-two, and he implied he used drugs during the period as well. (Tr. at 342.) The details are vague and, like his recollections of his academic performance, emanate entirely from Plaintiff's memory. He believes these thin citations to the record suffice to show a range of adaptive deficits prior to age twenty-two and fails to adduce any other facts from the developmental period.

The evidence does not support Plaintiff's contentions, and the ALJ correctly found that the paucity of facts from his youth could not bear the weight of Listing 12.05. Courts facing Listing 12.05 arguments usually require contemporaneous tests or evaluations from the developmental period. As the Sixth Circuit stated, "[W]e generally require a claimant to meet this requirement [of pre-age twenty-two deficits] through more definite means, such as providing the Commissioner

33

with scores from a test taken prior to the age of 22 or conclusions form an evaluation performed before Plaintiff had turned 22 . . . ." *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 873 (6th Cir. 2003). Elsewhere, it rejected evidence that the claimant had "significantly subaverage" intellectual function before age twenty-two because "[n]one of her testing or evaluation was contemporaneous with her developmental period." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001). Similar to the present case, the only relevant evidence in *Foster* was that she quit school after the ninth grade. *Id.* This failed to convince the court that she met the Listing: "[W]hy Foster did not continue her studies is unclear." *Id.*

Here, Plaintiff added a fragment more, stating he left school "because he felt he could not understand what was being taught." (Tr. at 343.) Yet, this self-report is insufficient to distinguish the case from *Foster*. It stands uncorroborated by contemporaneous evidence and is contradicted later in the same report, when Plaintiff stated he did not think he had a learning disability. (Tr. at 343.) And while IQ tests from the developmental period are not absolutely necessary, *West*, 240 F. App'x at 698, the only such test here occurred well after the period, when Plaintiff was thirty-six. (Tr. at 296.) *Cf. Burrell v. Comm'r of Soc. Sec.*, 238 F.3d 419, 2000 WL 1827799, at *2 (6th Cir. 2000) (unpublished decision) (finding that the plaintiff failed to meet the Listing where the only qualifying IQ test came at age twenty-six, and a test at fourteen scored his IQ at ninety-one). Though the Sixth Circuit has not required contemporaneous IQ scores, it rejected one claim without such evidence, noting that a "claimant must produce evidence beyond his present IQ scores to show that he exhibited deficits during his developmental period." *Turner.*, 381 F. App'x at 492. Moreover, as discussed below, the test's adequacy is somewhat diminished by Dr. Bray's observation that Plaintiff's efforts flagged during it. (Tr. at 295.)

34

Similarly, the record does not show adaptive functioning deficits prior to age twenty-two. This is dispositive without regard to the subaverage intelligence requirement. In *Parent v. Commissioner of Social Security*, a court in this District presumed subaverage intelligence from special education classes and a qualifying IQ score, but still rejected the Listing due to the lack of adaptive functioning deficits. No. 07-CV-12111, 2008 WL 1795019, at *8 (E.D. Mich. April 18, 2008) (adopting Report & Recommendation). Plaintiff no doubt endured a tumultuous childhood, shuffled between houses, dealing with an allegedly abusive father and the death of his mother, and drifting into episodes of homelessness. (Tr. at 342.) But these ordeals do not, without more, indicate adaptive functioning deficits. During this time, he found shelter with various family members and lived with a "girl" for three years. (*Id.*) Additionally, prior to the alleged onset date, he held steady work as a lead machinist for over three years and labored in other positions as well. (Tr. at 158-60, 190, 214.) He earned reported wages beginning in 1992, when he was around eighteen years old. (Tr. at 158.) In *Foster*, the Sixth Circuit found there was no deficit in adaptive functioning when the plaintiff had similar, if perhaps more complicated, work experience prior to the onset date. 279 F.3d at 355; *see also West*, 240 F. App'x at 698 (noting that the plaintiff's work history did not indicate adaptive functioning deficiencies). Finally, there were no diagnoses of mental retardation in the developmental period, which lends support to the ALJ's findings. *See Cooper*, 217 F. App'x at 452 (noting that no psychologist diagnosed the plaintiff with mental retardation and finding that he did not meet the Listing); *Bason*, 2014 WL 1328168, at *14 (noting that the ALJ can take notice of the absence of diagnoses)

The Sixth Circuit has often found insufficient the types of evidence Plaintiff proffers, even when established by more convincing proofs. The plaintiff in *Turner v. Commissioner of Social*

*Security* was held back in the ninth grade and dropped out on his second attempt to pass it. 381 F. App'x at 492. Nonetheless, this failed to convince the court that the plaintiff met the "diagnostic description." *Id.* Likewise, the plaintiff in *Foster* had a post-developmental period IQ score in the upper 60s and dropped out after finishing the ninth grade; but the court decided this did not satisfy the Listing requirements. 279 F.3d 348, 352, 354-55. In *West*, the court again rejected the Listing argument of a plaintiff who had "a seventh-grade education; [read] and [wrote] at a third-grade level; and [whose] most recent IQ tests reveal[ed] a verbal IQ of 67, performance IQ of 72, and full-scale IQ of 66." 240 F. App'x at 963-94. Summarizing these holdings, it later stated, "[T]his Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). Plaintiff has offered little more than this, and only by self-reports rather than documented evidence. Thus, I suggest his arguments fail to show he met Listing 12.05.

Because his proof is so lacking, I further suggest that the ALJ was not required to discuss the Listing at all. This is important for a reason that Plaintiff overlooks, but which the Court will address nonetheless. The record lacks any medical opinion on whether Plaintiff's impairments equal Listing 12.05. Dr. Pinaire, who helped the agency make the initial decision to deny benefits, only considered Listings 12.02 and 12.09. (Tr. at 72-73.) No other medical source opined on whether his impairments combined to equal Listing 12.05.

Yet, as the Commissioner has noted, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the

36

record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3. Accordingly, courts frequently remand if the record contains no equivalence opinion. *See, e.g.*, *Reynolds*, 424 F. App'x at 415 ("No analysis whatsoever was done as to whether [the claimant's] physical impairments . . . met or equaled a Listing . . . despite [the ALJ's] introduction concluding they did not."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272, 1995 WL 697215, at *2 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (unpublished table decision); *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23-25 (E.D. Mich. Mar. 13, 2014) (remanding where no expert opinion on equivalence existed) (adopting Report & Recommendation); *Klink v. Comm'r of Soc. Sec.*, No. 12-15172, 2014 WL 902707, at *8 (E.D. Mich. Mar. 7, 2014) (same) (adopting Report & Recommendation); *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *8-9 (E.D. Mich. Feb. 21, 2014) (same) (adopting Report & Recommendation); *Roberts v. Comm'r of Soc. Sec.*, No. 12-14661, 2013 WL 6062018, at *11-14 (E.D. Mich. Nov. 18, 2013) (same) (adopting Report & Recommendation); *Zaft v. Comm'r of Soc. Sec.*, No. 12-13415, 2013 WL 5340772, at *12 n.2 (E.D. Mich. Sept. 23, 2013) ("The great weight of authority holds that a record lacking any medical advisor opinion on equivalency requires a remand.") (adopting Report & Recommendation).

But here, any error in failing to obtain an equivalence opinion would be harmless because the ALJ did not need to analyze Listing 12.05 in the first place. An ALJ does not need "to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013)). Instead, the ALJ must only discuss relevant Listings

"where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)). A "substantial question" is not raised by simply assembling a few pieces of evidence the ALJ could have used; the claimant "must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.*

Two recent cases discussing this standard dealt with Listing 12.05 and found that the ALJ did not need to address that Listing in light of the slim evidence the plaintiffs offered. *Id.* at 432-36; *Sheeks*, 544 F. App'x at 641-42. In *Smith-Johnson*, the Commissioner either admitted or waived her argument on most of the Listing's elements. *Smith-Johnson*, 579 F. App'x at 433. The dispute thus came down to whether the evidence raised a "substantial question" that the plaintiff satisfied the "diagnostic description," the same provision at issue in the present case. *Id.* at 433-34. The court cited many reasons that the plaintiff did not, extensively discussing the medical opinions. *Id.* at 434-35. At the end of its analysis, the court stated that even if subaverage intellect existed, the plaintiff could "point[] to no record evidence that her purported intellectual deficiencies manifested prior to age twenty-two." *Id.* at 435-36. Specifically, the plaintiff was not in special education and, despite difficulties, finished high school. *Id.* at 436. The ALJ thus did not err by failing to assess Listing 12.05. Similarly, in *Sheeks*, the plaintiff "point[ed] only to his special education classes [in elementary school] and his failure to finish high school." 544 F. App'x at 642. The claimant argued that he could not pay attention in school; but the court noted that he did not participate in special education in high school and eventually obtained his GED. *Id.* Consequently, he failed to present a "substantial question" concerning the Listing.

The analysis in these cases leads this Court to suggest that the record here did not trigger the ALJ's duty to analyze Listing 12.05, rendering harmless any mistake he made by not gathering an equivalence opinion. As the Sixth Circuit has noted, "a finding of equivalence under Listing 12.05(C) will 'very rarely be required.'" *Foster*, 279 F.3d at 355 (quoting *Riley v. Apfel*, 162 F.3d 1162, 1998 WL 553151, at *5 (6th Cir. 1998) (unpublished decision) (quotations omitted)). There, the court held the ALJ's analysis sufficed, without any mention of an equivalence opinion. *Id.* Plaintiff here has failed to raise a "substantial question" meriting any analysis, let alone a remand to obtain such an opinion. The entire body of evidence concerning his developmental period came from his reminiscences transcribed by a few examiners. The content of those recollections, even if more persuasively documented in contemporaneous accounts, does nothing more than show he struggled in school and moved around as a teenager. Sixth Circuit precedent establishes that such evidence cannot alone prop up a Listing 12.05 argument. *See Smith-Johnson*, 579 F. App'x at 432-36; *Sheeks*, 544 F. App'x at 642; *Turner*, 381 F. App'x at 492; *Hayes*, 357 F. App'x at 677; *Foster*, 279 F.3d at 355.

It did not occur to Dr. Pinaire to analyze this Listing, (Tr. at 72-73); and more tellingly, it was not one of the Listings Plaintiff's counsel asked the ALJ to consider in her opening statement at the hearing. (Tr. at 33.) Dr. Bray's test registered Plaintiff in the "retarded range of cognitive function" and suggested a developmental learning disorder, but this does not sufficiently address Plaintiff's intellectual capacity before he turned twenty-two. (Tr. at 297-98.) Noting the limitations of IQ testing, the regulations state that they "are only part of the overall assessment" and "the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history . . . ." 20 C.F.R. pt. 404, subpt. P,

App. 1, 12.00(D)(6). The only documented retardation diagnosis thus suffers the same flaws as the other evidence. None of it gives flesh to the developmental period. Facing this skeletal record, the ALJ did not need to scavenge for an equivalence opinion.

    **b.**    **Listing 12.02**

Listing 12.02 deals with organic mental disorders, which are "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. pt. 404, subpt. P, App. 1, 12.02. The severity of the disorder is gauged by two tests, either of which are sufficient. The first requires the claimant to meet both the "A" and "B" criteria:

> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following . . .
>
> > 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
> >
> > 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or . . .
> >
> > 5. Disturbance in mood . . . .
>
> AND
>
> B. Resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or
> >
> > 2. Marked difficulties in maintaining social functioning; or
> >
> > 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> >
> > 4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. pt. 404, subpt. P, App. 1, 12.02. "Marked" is a regulatory measurement on a five-point scale rating severity: none, mild, moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The second test, met by fulfilling the "C" criteria, is not at issue here, as Plaintiff presents no argument he satisfies it. (Doc. 15 at 15-19.) Thus, to prevail, the claimant must first show the psychological or behavioral abnormalities, then demonstrate the requisite severity. *Taylor v. Barnhart*, 189 F. App'x 557, 563 (7th Cir. 2006); *Hight v. Comm'r of Soc. Sec.*, No. 1:08-CV-1062, 2010 WL 889939, at *8 (W.D. Mich. Mar. 10, 2010).

Plaintiff seeks to establish the first factor–documented behavioral abnormalities–with evidence of his head injury. (Doc. 15 at 16.) He told Dr. Salomon and Dr. Bray that he was hit in the head with a baseball bat as a child. (Tr. at 286-87, 293.) This thin contention does not support the presence of an organic disorder. It is not bolstered by diagnostic testing, as the regulation envisions when it requires that a "[h]istory and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state . . . ." 20 C.F.R. pt. 404, subpt. P, App. 1, 12.02. Similar assertions by the claimant in *Gibson v. Colvin* that he was beat by police in the head, requiring a metal plate, were insufficient to even trigger the ALJ's duty to examine Listing 12.02. No. 2:12-131-DCR, 2013 WL 3733516, at *7-8 (E.D. Ky. July 15, 2013).

Dr. Tomashevski's notes provide the only mention of a mechanized test of Plaintiff's brain, an MRI finding normal results. (Tr. at 271.) Plaintiff relies on two minor statements from Dr. Bray. (Doc. 15 at 16.) Dr. Bray thought Plaintiff displayed the "signs and symptoms of a closed-head injury," but found on the Bender Gestalt test only "soft signs of organicity." (Tr. at 297-98.) Aside from these observations, the record lacks any evidence of organic disorder, that is, "a discernable

41

alteration in the normal anatomical . . . structure of the brain." J.E. Schmidt, 4 *Attorneys'*
*Dictionary of Medicine and Word Finder* O-90, O-91 (2013) (defining "organic brain syndrome").
"[S]oft signs of organicity," the closest and most convincing evidence, does not indicate a history
of abnormalities "judged" to be related to "a specific organic factor . . . ." 20 C.F.R. pt. 404, subpt.
P, App. 1, 12.02.

The ALJ also properly considered the severity factors. (Tr. at 17-18.) Plaintiff's daily
activities are not markedly restricted. The ALJ observed that Plaintiff can manage his personal
care, despite sometimes skipping a shower when he stays in, and also cook simple meals. (Tr. at
17, 47.) Plaintiff testified that he could leave the house without assistance. (Tr. at 47.) While he
claimed at the hearing and elsewhere that he did not to walk or take the bus, (Tr. at 50-51, 203),
he also stated many times that he walked and rode his bicycle for transportation and exercise, (Tr.
at 293, 344, 348), and no one opined that he had trouble walking, (Tr. at 243, 287). He also
mentioned at the hearing that he drove just one month before. (Tr. at 49.) He told Dr. Bray that his
daily activities included "check cashing, attending church, watching TV, taking walks, playing
cards, and making appointments." (Tr. at 294.)

His social functioning was also extensive enough to support the ALJ's findings. The ALJ
noted that he could shop with friends, ride in cars, visits friends, and "spend[] time with others
every day." (Tr. at 17.) Plaintiff takes issue with the ALJ's characterization, noting that he spent
time with others because he was homeless and they helped him. (Doc. 15 at 17-18.) But this gets
at the reasons why he sees them, not the critical fact that he does spend time with them. Social
functioning centers on his ability to relate with others and the ALJ properly took this into account.
Plaintiff also complains that the ALJ distorted his shopping: He shops only if he has to, and only

42

if accompanied. (Doc. 15 at 17; Tr. at 40-41, 201.) The ALJ said no more than this. Moreover, the record contains abundant evidence that he did not suffer marked limitations in this area. In his Function Report, he stated he ate and watched television with others everyday; his father brought him to friends' houses; and he twice denied having "problems getting along with others. (Tr. at 202-03.) Dr. Bray wrote that his relationship with family and friends was "Fair" according to Plaintiff. (Tr. at 293.) He also testified that he had multiple visits with his father and sister each week, though he denied talking with them during the trips. (Tr. at 49.) Though he told the ALJ he did not attend church, he informed Dr. Bray that he did. (Tr. at 50, 294.) He lived with "a girl" for three years when he was around age twenty, (Tr. at 342), and he now lived with friends, (Tr. at 198, 293, 332.) Dr. Lok mentioned that Plaintiff had a girlfriend. (Tr. at 249.) He also attended addiction meetings. (Tr. at 251, 336, 349.) The record contains evidence of sufficient social contact to support the ALJ's findings.

The ALJ also adequately analyzed Plaintiff's ability to maintain concentration, persistence, and pace. (Tr. at 17-18.) He noted that Plaintiff could read and write, watched television throughout most of the day, and handled finances. (*Id.*) Plaintiff is dubious that gluing himself to the television takes great powers to concentration. (Doc. 15 at 18.) The Court is inclined to agree, though it still finds that this was valid evidence lending some, if not much, support. A few courts have rejected television viewing as persuasive evidence.[4] Yet, many courts, including the Sixth

---

[4] *See, e.g.*, *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) ("[W]e are skeptical that the ability to watch television for several hours indicates a long attention span . . . ."); *Demars v. Comm'r of Soc. Sec.*, No. 11-15394, 2013 WL 1326300, at *6 (E.D. Mich. Mar. 31, 2013) ("Television watching . . . provide[s] little information on the plaintiff's ability to concentrate."); *Thatcher v. Comm'r of Soc. Sec.*, No. 12-10288, 2013 WL 1316963, at *8 (E.D. Mich. Feb. 15, 2013) ("The ALJ cited to the fact that Plaintiff could concentrate on a television show for thirty minutes, but he did not provide any discussion as to how this translated into a finding that Plaintiff could sustain concentration on a job for eight hours a day, five days a week, forty hours per workweek, even a job requiring only simple, unskilled work.") *Report & Recommendation adopted by* 2013 WL 1316987, at *1 (E.D. Mich. Mar. 29,

Circuit, have accepted it as valid evidence that the plaintiff can concentrate, usually when other relevant facts accompany it and the RFC limits the plaintiff to simple tasks.[5] Here, the ALJ cited multiple reasons for his conclusion and the RFC does not require substantial concentration, instead limiting Plaintiff to simple, unskilled work. (Tr. at 17-19.) Elsewhere in the decision, the ALJ observed that Plaintiff maintained clear and logical thought processes at the Community Care Services session. (Tr. at 334.) *See White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629, at *7 (E.D. Mich. Sept. 16, 2013) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (holding that the court could examine ALJ's entire decision to decide whether the step three analysis was adequate)). He also told Dr. Bray he played cards, which indicates ability to concentrate. *See Powers*, 207 F.3d at 435 (noting that playing cards suggested a long attention span).

---

2013); *Gillespie v. Comm'r of Soc. Sec.*, No. 08-CV-13233, 2009 WL 919996, at *3 (E.D. Mich. Apr. 2, 2009) (finding that watching television was not evidence of concentration "[b]ecause Plaintiff never explicitly or implicitly said that she is able to concentrate when she watches television (and in fact her testimony is just the opposite)"); *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 931 (E.D. Mich. 2005) (adopting Report & Recommendation) ("The ALJ's argument [concerning] Plaintiff's daily watching of television [was] not sufficient evidence on this record to conclude her concentration is not significantly impaired.").

[5] *See, e.g.*, *Pratt v. Barnhart*, 158 F. App'x 643, 644-45 (5th Cir. 2005) (noting that watching television "suggest[ed] some ability to concentrate"); *Littlepage v. Chater*, 134 F.3d 371, 1998 WL 24999, at *5 (6th Cir. 1998) (finding substantial evidence where "[t]he ALJ also noted that Littlepage had testified that she watched television and played Nintendo games on a regular basis, which suggested that her ability to concentrate was greater than she claimed"); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (noting that watching television showed ability to concentrate); *Berg v. Comm'r of Soc. Sec.*, No. 13-11844, 2014 WL 4855337, at *10 (E.D. Mich. Sept. 30, 2014) (adopting Report & Recommendation) (noting that the plaintiff's ability to watch television, combined with other evidence, indicated "sufficient concentration to complete simple one or two-step[] tasks"); *Marini v. Comm'r of Soc. Sec.*, No. 13-10067, 2014 WL 1230034, at *18 (E.D. Mich. Mar. 25, 2014) (noting that watching television was evidence of concentration); *Lash v. Comm'r of Soc. Sec.*, No. 09-12324, 2010 WL 931914, at *3 (E.D. Mich. Mar. 11, 2010) (adopting Report & Recommendation) (same); *Demars v. Comm'r of Soc. Sec.*, No. 08-13936, 2009 WL 1803239, at *5 (E.D. Mich. June 24, 2009) (adopting Report & Recommendation) ("The ability to read or watch television stands in sharp contrast to his allegation that he suffered from a complete inability to concentrate."); *Latarte v. Comm'r of Soc. Sec.*, No. 08-13022, 2009 WL 1044836, at *3 (E.D. Mich. Apr. 20, 2009) (adopting Report & Recommendation) (noting that watching television was evidence of concentration); *Giancola v. Shalala*, 913 F. Supp. 638, 645 (D. Mass. 1996) (noting that it was evidence of ability to concentrate).

Plaintiff also disagrees that his ability to handle finances shows he can concentrate. (Doc. 15 at 18.) The ALJ referenced Plaintiff's Function Report, in which he stated he had no problems managing his money. (Tr. at 17-18, 201.) Plaintiff questions his reliance on this evidence because his friend, Ms. Gonzales, filled out the form, and Plaintiff had earlier stated that she handled his funds. (Tr. at 298.) Further, he claims that his math skills tested at the first-grade level and Dr. Bray concluded that he could not handle his benefit funds if awarded. (Tr. at 297-98.) Nonetheless, the evidence is sufficiently ambiguous that the ALJ could properly cite the Report. The Function Report, though filled out by Ms. Gonzales, was drafted in the first person, appearing to reflect that she wrote what Plaintiff instructed. (Tr. at 199-205.) Moreover, his comments to Dr. Bray are also unclear. He stated that Ms. Gonzales dealt with his money, but also said he cashed his checks "independently." (Tr. at 294.) The testing showed he could perform the addition and subtraction necessary to handle many basic financial functions. (Tr. at 295.) From these countervailing signals, the ALJ could conclude that the Report meant what it said.

Finally, the only opinion evidence in the record supports the ALJ's conclusion. Dr. Pinaire, the state agency's reviewing psychologist, determined that Plaintiff suffered only "Mild" or "Moderate" restrictions in the "B" criteria and did not meet the "C" criteria. (Tr. at 73.) She explained that his "cognitive processes were unremarkable during phone contact with examiner." (*Id.*) Further, he appeared able to undertake the simple tasks that ended up in the ALJ's RFC. (Tr. at 77.) Dr. Pinaire, as a consultant, is a "highly qualified . . . expert" and the ALJ must consider her opinion. SSR 96-6p, 1996 WL 374180, at *2. Since it constituted the only opinion evidence on the matter, and that the rest of the evidence is insufficient, substantial evidence supported the ALJ's Listing analysis.

### c.     Credibility

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. §§ 404.1528(a)., 416.928(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)     [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)   Precipitating and aggravating factors;
>
> (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)     Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

Plaintiff's first complains that the ALJ mentions he received unemployment benefits requiring him to attest he could "perform suitable full-time work." Mich. Comp. Laws § 421.28(1)(a); (Doc. 15 at 19-20; Tr. at 16.) His legal argument cites only a non-binding memorandum drafted by the chief ALJ that recognizes receipt of unemployment benefits is a valid credibility factor but notes that "the underlying circumstances will [often] be of greater relevance . . . ." Memorandum from Cristaudo, *supra* at 1. Plaintiff then ends his argument by contending that "the ALJ did not make any further inquiry of Brian Nace to understand the 'underlying circumstances' . . . ." (Doc. 15 at 20.) He is mistaken. First, the ALJ cautiously qualified his use of this evidence, noting the Commissioner's position that unemployment insurance is not inconsistent with disability. (Tr. at 16.) It was not "determinative" but it "bears negatively on the . . . claimant's credibility," the ALJ concluded. (*Id.*) This approach is much more tepid than the Sixth Circuit's: "Applications for unemployment and disability benefits are inherently inconsistent. . . . There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.'" *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801-02

48

(6th Cir. 2004) (quoting *Bowden v. Comm'r of Soc. Sec.*, 173 F.3d 854, 1999 WL 98378, at *7 (6th Cir. 1999) (unpublished decision)). Consequently, courts routinely countenance this evidence in the credibility analysis, particularly when it is among a body of other evidence and the ALJ does not give it undue weight.[6]

Contrary to Plaintiff's assertion, the ALJ did look to the "underlying circumstances." The ALJ discredited Plaintiff's complaints of panic attacks. (Tr. at 19.) Plaintiff argues that the reasoning here is "unclear," and asserts simply that "[t]here is nothing in the record to indicate that plaintiff's testimony is untrue or exaggerated." (Doc. 15 at 20.) Yet, the ALJ explained his conclusion, citing the fact that Plaintiff could shop and attend appointments with friends and also attended church. (Tr. at 19-20, 40-41, 294.) He also went to addiction meetings and one group session at Community Care. (Tr. at 249, 251, 338-39.) The daily activities, another credibility factor, were addressed appropriately in the Listing analysis. (Tr. at 17.) The ALJ also highlighted other inconsistencies. Despite numerous complaints of pain, medical sources did not observe fatigue or problems walking. (Tr. at 20.) Indeed, Plaintiff's assertions that he struggled to walk, (Tr. at 50-51, 203, 293), are belied by every objective measure of his ambulation and mobility, (Tr. at 243, 287), and even his own earlier admissions, (Tr. at 294, 344, 348).

---

[6] *See, e.g.*, *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (noting that receipt of unemployment benefits is evidence); *Schmidt v. Barnhart*, 395 F.3d 737 (7th Cir. 2005) (noting that applications for unemployment benefits could play a role in assessing credibility); *Johnson v. Chater*, 108 F.3d 178, 180-81 (8th Cir. 1997) (same); *Webster v. Colvin*, No. 3:13-CV-497, 2014 WL 4095341, at *10 (E.D. Tenn. Aug. 19, 2014) (adopting Report & Recommendation) (holding that it can be considered, but cannot be the sole rationale for discounting credibility); *Battice v. Comm'r of Soc. Sec.*, No. 1:12-CV-1389, 2014 WL 1366489, at *10 (W.D. Mich. Mar. 31, 2014) (adopting Report & Recommendation) ("It was entirely appropriate for the ALJ to draw an adverse inference regarding plaintiff's credibility from his application for unemployment benefits during the period he claims to have been disabled."); *Davenport v. Comm'r of Soc. Sec.*, No. 10-11350, 2011 WL 2601017, at *7 (E.D. Mich. Nay 9, 2011) ("The ALJ was entitled to discount her credibility on the basis that she applied for DIB immediately upon the expiration of her unemployment benefits."), *Report & Recommendation adopted by* 2011 WL 2601042, at *6 (E.D. Mich. June 30, 2011); *Duncan v. Comm'r of Soc. Sec.*, No. 08-11067, 2009 WL 2843918, at *1 (E.D. Mich. Aug. 31, 2009) (finding that the ALJ can use this evidence).

The ALJ also noted the treatment gap, which Plaintiff asserts was the product of impecunious circumstances, (Doc. 15 at 21; Tr. at 346), and in any case is not highly probative when mental health issues are present. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) ("[P]eople with serious psychiatric problems are often incapable of taking their prescribed medications consistently."); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) ("For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself."). But such gaps can provide cause to discount credibility in certain cases. *See, e.g.*, *McClain v. Comm'r of Soc. Sec.*, No. 10-11141, 2011 WL 4599611, at *2 (E.D. Mich. Sept. 30, 2011) ("While the question is a close one, the Court agrees . . . that the ALJ properly looked to the materials in the administrative record, rather than engaging in impermissible speculation, in concluding that Plaintiff's failure to follow through with recommended mental health treatments provided a basis for discounting her credibility."). Here, the ALJ briefly mentioned the gap and there is no indication the ALJ placed undue weight on it. The only potential error would be that the ALJ gave this factor a smidgeon too much emphasis; but that would not merit remand.

Plaintiff next criticizes the ALJ for questioning the validity of Dr. Bray's IQ testing. (Doc. 15 at 22-23.) This contradicted the credence the ALJ gave Dr. Bray's other findings and amounts to "cherry picking" the favorable aspects and disregarding the unfavorable. (*Id.*) The ALJ gave reasoned explanations for his treatment of the opinion. While Dr. Bray considered the scores valid, he also noted that Plaintiff gave the tests less effort than he did other parts of the interview. (Tr. at 295-96.) An ALJ does not encroach on an expert's turf by questioning the validity of test scores, especially when the expert's own comments evince doubts. *See, e.g. Dragon v. Comm'r of Soc. Sec.*, 470 F. App'x 454, 462 (6th Cir. 2012) ("The regulations permit the ALJ to question the

validity of test results in conjunction with other factors."). The ALJ did not throw them out entirely, but simply questioned their validity because of Dr. Bray's comment and the inconsistencies with his other observations. (Tr. at 22.) IQ scores are only one aspect and cannot alone satisfy Listing 12.05's definition of mental retardation. *See Blanton*, 118 F. App'x at 7. The more probative evidence, then, was Dr. Brays overall assessment, which provided a holistic view of the interview and testing portions. The ALJ properly credited these conclusions. (Tr. at 22.) The only finding he failed to give significant weight was Dr. Bray's determination that Plaintiff social abilities suffered moderate to significant limitations; but as described above, the ALJ found abundant evidence that Plaintiff interacted with others, and thus he did not err by questioning Dr. Bray on this point.

Plaintiff's final argument relevant to credibility centers on the ALJ's statement that "no treating or examining source of record observed . . . signs of psychosis in the claimant (e.g., responding to internal stimuli, attempting to ignore internal stimuli, or significant disorientation)." (Tr. at 21.) Plaintiff correctly points out that Dr. Kang diagnosed psychosis. (Tr. at 336.) The ALJ's point, however, was that the psychosis remained unobserved, without empirical proof. He acknowledged Plaintiff professed to hearing voices; but neither Dr. Kang nor other examining sources witnessed the process. (Tr. at 21.) Instead, they found him coherent and oriented. (Tr. at 73, 252, 287, 302, 334.) Even if his mood sometimes reflected depression, (Tr. at 335), only a few subjective statements ground the psychosis claim, (Tr. at 332, 336, 340), and even these he contradicted in other statements, denying delusions, (Tr. at 293). He consistently stated he was not suicidal, (Tr. at 293, 335, 340, 352), and his suicide attempts, (Tr. at 340), are not evidenced in the

record. Finally, he offers no developed argument here that this impairment, alone or combined with others, is disabling.

### d.     RFC and Hypothetical

The claimant must provide evidence establishing the RFC. "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [the] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis. *Jones*, 336 F.3d at 474. In the first four steps, the claimant must prove her RFC. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have to add anything to the RFC. 20 C.F.R. §§ 404.1560(c), 416.960(c); *see also Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The VE's response to the ALJ's hypothetical constitutes valid evidence if the hypothetical includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

Plaintiff's last argument centers on the hypothetical question posed to the VE. (Doc. 15 at 23-25.) He contends that the hypothetical "lacked substantial evidence" because the ALJ only included restrictions on Plaintiff's interaction with coworkers, no supervisors. (*Id.*) The ALJ needed to add this element, Plaintiff states, because he developed the coworker limitation from Dr.

Bray's opinion but ignored the supervisor limitation in the same opinion. (Doc. 15 at 25.) "If the ALJ was relying on the psychologists [sic] listed limitations, he should have included all of the subparts of the opinion . . . ." (*Id.*) Plaintiff also points to the VE's testimony that an individual with "no useful ability" to function with supervisors could not find work. (Doc. 15 at 24.)

The argument fails for several reasons. First, nothing mandates the ALJ adopt an opinion *in toto* or not at all. An ALJ can parse an opinion and cull dubious propositions, as the ALJ here did with Dr. Bray's. Additionally, the VE's testimony does not align with the restrictions Dr. Bray posited. Dr. Bray thought that Plaintiff's "mental ability to relate to others, including . . . supervisors, [was] moderately to significantly impaired." (Tr. at 298.) The VE testified that an individual with "no useful ability" to relate to supervisors was unemployable. (Tr. at 60.) Moderate or even significant impairments do not precisely match "no useful ability." Even if the ALJ adopted Dr. Bray's opinion, then, the evidence would not demand that he find Plaintiff disabled. Moreover, by implying that Dr. Bray's opinion on supervisors equals a "no useful ability" finding, dovetailing with the VE testimony, Plaintiff ignores that Dr. Bray made the same comments–moderate to significant limitations–about "coworkers." (Tr. at 298.) Yet, Plaintiff does not contend that the ALJ botched the hypothetical by not including more aggressive restrictions on co-worker interactions. Thus, even under his own reasoning, the opinion's proposed limitations would not necessarily support the "no useful ability" hypothetical Plaintiff desires.

More importantly, the ALJ did not need to incorporate this opinion. He already included a provision limiting interactions with the public and co-workers, which reflects the recorded evidence. (Tr. at 19.) Plaintiff classified his relationship with both co-workers and supervisors as "Poor," and claimed he argued with his peers. (Tr. at 293.) His testimony suggested that he was

fired from his last job because he argued with his supervisor. (Tr. at 36.) However, the record contains conflicting stories about his departure. He told Dr. Bray that "he was laid off when [the company] downsized." (Tr. at 293.) Another version appeared in Ms. Triplett's notes, stating that he "got in an argument with employees because he felt they weren't doing their job and was laid off . . . ." (Tr. at 343.) The ALJ's resolution integrated the different tales and made no explicit provision for supervisors. The few, sparse statements describing his problems at work did not require the ALJ to branch out different restrictions for different groups in the business hierarchy. The consistent theme in the statements was his difficulty with co-workers and the hypothetical and RFC captured this. Moreover, Dr. Pinaire thought he had only moderate limitations with co-workers and supervisors. (Tr. at 76.) Additionally, the ALJ elsewhere observed that his social functioning was higher than Plaintiff claimed, suggesting the same about his ability to relate in the workplace. I therefore suggest that Plaintiff's argument lacks merit.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another

party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2015                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge